68

UNITED STATES v. 5.77 ACRES OF LAND, MORE OR LESS, IN BOROUGH OF BROOKLYN, KINGS COUNTY, et al.

No. 589.

District Court, E. D. New York.

Oct. 14, 1943.

Motion for New Trial Dismissed Dec. 30, 1943.

See 3 F.R.D. 298.

Harry T. Dolan, Sp. Asst. to Atty. Gen., (Edward H. Murphy, Sp. Atty., Department of Justice, of Brooklyn, N. Y., of counsel), for petitioner-plaintiff.

Charles Lamb, of New York City, (Gerard L. Carroll, of New York City, of counsel), for Conover Pier Corporation.

BYERS, District Judge.

It is necessary to fix the so-called fair market value as at September 25, 1941, of pier 44, Brooklyn, which was condemned pursuant to 40 U.S.C.A. § 258a, by the federal government for use by the United States Navy.

The damage map shows the somewhat unusual make-up of the property, which embraces upland containing an office building, the upland being bulkheaded and embracing a space covered by concrete blocks, and the pier itself, which rests upon land under water, and dredged slips on both sides of the pier, and also a small dock or bulkhead which adjoins pier 45 lying southerly from pier 44.

The pier is composed of substructure and superstructure, and is 560 feet long by 90 feet in width. The superstructure or pier shed is of corrugated iron of standard type with steel frame and trusses giving a clear span on the pier. The height from the deck of the pier is 22 feet, and the roof, which is carried on trusses, is 12 or 15 feet higher.

There are twenty-eight 20-foot bays within the pier, and mechanically operated doors occupying every other bay, built of structural steel and wood with patent mechanism for folding and raising the doors.

The roof is of tar and gravel on a felt base. The structural steel frame consists of columns and trusses, each column being anchored into the concrete deck by two 1½ inch bolts.

The substructure of the pier and the bulkheads are of the same type of construction; namely, "low water cutoff platform", with a concrete base wall along the front and fill behind that. This means that the piles are cut off about one foot above low water, and are capped in rows, and decking is placed longitudinally on top of the caps.

As to the pier, the piling, which has been described, provides for a solid filled in element which is 50 feet wide, extending outshore under the center of the deck of the pier, the space within the piles being filled in with cinders, etc., so as to constitute a solid base to support the deck of the pier, 50 feet in width; this means that on either side of that center strip there is 20 feet of pier construction supported by piles.

On the upland there are the following buildings:

One 1-story office building, constructed of 8-inch concrete block walls up to the window sills, above which there is 8-inch terra-cotta construction to the roof line. The roof is asphalt covered and of wood construction, and is pitched and forms a small attic. The building is 83 feet, 10 inches long by 17 feet, 4 inches wide, and rests upon a 12-inch concrete footing of 4 feet below ground level; it has an 8-inch concrete floor, wood covered, and the building is divided into six rooms, including a boiler room. The ceilings and walls are plastered in all the rooms except the boiler room.

There is also a 1-story frame building, 22 feet by 25 feet, called the paint shop, the interior of which is covered with galvanized iron sheeting.

All of the bulkhead and upland between the office and the pier is paved with asphalt blocks on 6-inch concrete base.

The pier is constructed on land under water and extends out to the pier-head line adopted by the War Department on April 4, 1907. On the southerly side of

the pier, the damage map shows ownership of land under water, of about 145 feet in width, with a diagonal cutoff at the outer end to indicate the theoretical position of the line of sea wall, outshore of which the title to the land under water is not vested in the claimant but in the State of New York.

On the northerly side the land under water is very much wider at the outer end of the pier than inshore, although ownership on the part of the claimant does not extend beyond the line of sea wall which has been mentioned; however, there is no impediment to the use of both slips of the pier to its full extent by reason of the ownership on the part of the State in the bed of the Red Hook Channel into which the pier extends.

While the elements which go to make up the property of the claimant can be identified as land under water, upland, pier substructure and pier superstructure, buildings and bulkheads, the property must be considered as a whole, the value of which in the practical sense is more than the sum of its parts.

The land under water, for instance, would have no substantial value as such, but its width on the northerly side guarantees that no similar structure can be erected so as to cut down the size of the slip on that side; that width renders it possible for a deep draft vessel to lie alongside and outside one which is moored to the pier.

The type of pier construction is probably more costly and substantial than is to be found in other comparable structures, but it does not follow that adequate compensation should not be made to the owner on that account.

The weight-bearing capacity of the deck of the pier is enhanced because of the substantial nature of the substructure, and the maintenance costs of the latter in the matter of pile renewal are much lower than they would be otherwise.

If the government saw fit to take that type of pier, it would seem that compensation should not be computed on a basis that would apply to something less substantial or to a pier not possessing the advantage of the wide and deep slips which pertain to this particular pier. The testimony is that the slips have been constantly maintained at a depth of 31 feet, which means that the original dredging and the necessary maintenance of that depth have been among the major items of expense.

I visited the property during the last few days of June after the taking of testimony and was very favorably impressed by the substantial character of the property in its entirety.

The difficulty of arriving at a figure representing just compensation is enhanced by the lack of comparable sales, which in itself is not surprising, in view of the character of the property. A similar condition was referred to in 1924 in the case of People ex rel. New York Dock Co. v. Cantor, 208 App.Div. 52, 203 N.Y.S. 424.

The three sales referred to by the government witnesses were not comparable either as to the character of the pier, size or location, nor does the government brief assert the contrary.

Thus the Court is thrown entirely upon opinion testimony as to the value of the property, and little of that opinion is persuasive.

All witnesses have stated theoretical units of value of the upland and the land under water, without making a convincing showing. The solid, substantial and uncontradicted fact is that the claimant paid $189,447.92 for the land in the year 1911, and completed the erection of the pier in 1918.

There have been no sales of comparable property brought to light which tend to prove that in 1941 either the upland or the land under water had changed in value. While the date of purchase is remote, the figure of the cost price is at least factual as distinguished from the diverse opinions based upon the theories of the various witnesses who testified. For comparison, the values as stated by them will be listed:

By the claimant's witness Partridge, $363,600.00
By the government's witness Morrison, $144,000.00
By the government's witness Niland, $148,580.00

These conclusions were based upon various unit prices for the land under water and the upland, respectively, which were probably satisfactory to a given deponent, but were unconvincing because there were no comparable sales of land under water alone; where upland and land under water were cited in connection with the very few sales of pier or wharf properties mentioned in the testimony, the other elements going to make up the said properties as a whole

differed so fundamentally from pier 44 as to afford no substantial basis of comparison, in my opinion.

The most sensible and convincing exhibit in the case, on the subject of values, is the application for reassessment addressed by the claimant to the tax authorities of the City of New York on March 14, 1941, about six months prior to this taking, for it represents a figure which the taxpayer believed to be just for the purpose of municipal taxation, and in that the cost figure above quoted is set forth, and the argument is made that for the year 1940 the land should not be assessed for more than $175,000, although that opinion seems not to be supported by data consistent with it.

Bearing in mind that the real estate itself possessed only a potential value standing alone, it is my opinion that it would be fair to assign the cost price as the fair basis for compensation in this proceeding, because no fluctuations in the intervening years have been indicated or were suggested by the evidence; consequently the valuation of $189,447.92 will be adopted for present purposes.

As to the pier and other structures, there is a wide range of opinion evidence. The government witnesses offered the following figures, based upon a study of charts and bulletins of building costs in 1941:

| Niland, | $175,000.00 |
|---------|-------------|
| Morrison, | $226,000.00 |

Since both testified on cross-examination that they did not consult with a builder in compiling their figures, their testimony will be disregarded, because neither was a builder nor asserted first-hand experience with building and construction of this kind, or the costs thereof.

The claimant presented testimony by McCullough, who designed the pier and who certainly demonstrated an intimate knowledge of such things, that the reproduction value was $1,057,095 less depreciation, giving a sound value of $680,027.

Partridge gave his opinion as to the 1941 value of the improvements at $486,400.

It is necessary to contrast these statements, however, with the same application for reassessment to which reference has been made, which discloses that, under date of March 13, 1941, the Robbins-Ripley Company, Engineers-Contractors, presented a schedule of 1941 reproduction costs showing a total of $573,095.

With the claimant's own witnesses and records showing such a diversity of figures, it is scarcely to be thought that the Court can do more than attempt its own estimate based on the most persuasive figures.

The said application for reduction in taxes discloses that the cost of the improvements when the pier was completed in 1918 was $751,229.46.

To me this is a more convincing datum than a so-called reproduction cost less depreciation.

The consensus of the testimony is that the probable life of the pier and bulkhead and other improvements is 50 years, which is also an opinion or estimate depending of course on the fidelity of maintenance of all elements of the property.

That consensus will be accepted, and accordingly a flat write-off of 46% will be adopted, as 23 years of the estimated life of the improvements had elapsed at the time of taking.

This gives a value of $405,663.91 to the improvements at the time of taking.

It is realized that the bulkheads and substructure perhaps have been written off too generously, and likewise that the argument would probably run the other way as to the superstructure.

The result arrived at, which fixes the entire award at $595,111.83, is based upon known factors as far as possible, which are more persuasive to me than the various theories which have been propounded by the opinion witnesses.

The rental in 1941 was at the rate of $37,706.88 per year, and all witnesses agreed that rental values of pier property enhanced beginning in 1939, and continued to rise thereafter.

For some reason which has eluded my understanding, the government witnesses were of the opinion that the fee values did not rise at all in spite of that increase in rental values. I should suppose that the two were necessarily related, though perhaps not in any fixed ratio.

The award will be as stated above, $595,111.83.

Settle order.